UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

United States of America

**Report and Recommendation**

v.                                                14-CR-165A

Christian O. Dalmau,

Defendant.

## I.    INTRODUCTION

On the night of January 5, 2014, Buffalo police officers pulled over a white GMC Yukon

and arrested defendant Christian Dalmau ("Dalmau"), who was sitting in the front passenger seat.

Officers pulled over the vehicle because it matched the description that police dispatch received of

a vehicle that fled the scene of a shooting that occurred about 20 minutes earlier about eight miles

away.  Without either giving Dalmau his *Miranda* rights or asking him anything, officers placed

Dalmau in a patrol car and brought him to police headquarters for questioning.  While Dalmau

was in the patrol car, officers noticed a small quantity of pills wrapped in aluminum foil in the

back seat where Dalmau sat.  Three officers discussed the discovery of the pills in Dalmau's

interview room, supposedly among themselves but within Dalmau's earshot.  Dalmau, who does

not speak English, allegedly felt the need to cut into the officers' conversation and to comment

spontaneously that the pills were his and that he was addicted to them.

Dalmau now faces one count of possession of a firearm by an unlawful user of oxycodone,

a Schedule II controlled substance, in violation of 18 U.S.C. §§ 922(g)(3), 924(a)(2), and 2.  About

two weeks after the events in question, officers found a hidden compartment in the GMC Yukon

that contained more pills and a handgun; the Government is attributing possession of the handgun at least in part to Dalmau.  On February 26, 2016, Dalmau filed a motion to suppress. (Dkt. No. 21.)  Dalmau wants to suppress the first discovery of pills on the basis that the officers lacked probable cause to arrest him and to place him in the patrol car where the pills were discovered.  As for the alleged spontaneous statement, Dalmau has questioned whether it even happened, but even conceding for trial preparation purposes that it did, Dalmau wants the statement suppressed.  Dalmau believes that the officers' decision to have a conversation about the pills in his interview room and within five feet of him amounted to an investigation technique. The officers' intent to draw a statement, according to Dalmau, required the administration of *Miranda* rights.  The Government responds that the officers had probable cause to detain Dalmau based on information that they received in the immediate aftermath of the shooting.  The Government also argues that the officers had no conversations with Dalmau before homicide investigators arrived to conduct questioning, meaning that Dalmau's statement was truly spontaneous.

Judge Arcara has referred this case to this Court under 28 U.S.C. § 636(b).  (Dkt. No. 5.) The Court held oral argument on March 23, 2016 and held a suppression hearing on June 1, 2016.  For the reasons below, the Court respectfully recommends denying Dalmau's motion.

## II.     BACKGROUND

### A.     *General Background and Initial Events*

This case concerns allegations that Dalmau possessed a handgun and oxycodone pills for at least the time when he was a passenger in the GMC Yukon.  The events of January 5–6, 2014

began in northwest Buffalo, at or around 132 Newfield Street.  Around 10:06 PM, police dispatch

received the first call of shots fired and a man lying on the ground at 132 Newfield Street.  (Dkt.

No. 36 at 1.)  Over the next 20 minutes or so, officers communicating with each other and

through dispatch acquired the following information: multiple shots were fired, and a vehicle sped

away; the shooter entered the back of the vehicle; the vehicle was a white GMC Yukon or Yukon-

style truck, newer model, with halogen headlights; homicide detectives were notified; and at least

one person in the vehicle was overheard speaking Spanish.  (*Id.* at 2; *see also* Gov't Ex. 1C, 132

Newfield St. Recording No. 7.)  One of the officers listening to the unfolding communications was

Dennis Gilbert ("Gilbert").  Gilbert was on routine patrol, parked on Jefferson Avenue near that

street's overpass over the Route 33 Kensington Expressway, facing north.  (Dkt.  No.  31 at 26.)

From that position, Gilbert could see inbound traffic on Route 33 West to his right.  (*Id.* at 43.)

While other officers were trying to obtain information that would rule out specific vehicle models

like a Lincoln Navigator or a Dodge Durango (*id.* at 38), Gilbert spotted a white GMC Yukon with

purple halogen headlights heading inbound on Route 33 West toward downtown Buffalo (*id.* at

43).  Gilbert made a mental calculation that the vehicle's location and distance from the scene of

the shooting were consistent with the time that had elapsed since the shooting.  (*Id.* at 56; *see also*

Dkt. No. 36 at 7, 8.)[1]  Based on the first mention in the dispatch records of the place where

officers eventually planned to stop the vehicle, *see infra*, the dispatch records appear to support an

inference that Gilbert spotted the vehicle approximately 19 or 20 minutes after the first call of

---

[1] The Court takes judicial notice that, according to Google Maps, three slightly different routes
could bring a vehicle from 132 Newfield Street to around Gilbert's overpass in about 15–20 minutes
"without traffic."  *See* Appendix.

3

shots fired.  (Dkt. No. 36 at 2.)  Gilbert radioed to other officers that he spotted the vehicle and

began to follow it, without the use of sirens or turret lights, while updating his position on the

radio.  (Dkt. No. 31 at 47–48.)

B.      *Traffic Stop*

The next set of events on the night in question led to the vehicle stop that the parties have

litigated.  Shortly after Gilbert started following the GMC Yukon, the vehicle made two successive

left-hand turns and immediately returned to Route 33, now heading outbound in the eastern

direction.  (*Id.* at 48–49.)  Gilbert alerted other officers to the vehicle's change of direction; Gilbert

considered the change of direction suspicious because the vehicle "appeared to be going in a circle

with no purpose."  (*Id.* at 49.)  While Gilbert continued to follow the vehicle, other officers had

enough time to set themselves up at the Route 33 East exit to Bailey Avenue and to force the

vehicle to take that exit.  (*Id.* at 51, 55.)  Gilbert, Philip Serafini ("Serafini"), and other officers

immediately executed a stop of the vehicle.  The vehicle stop included Officer Oscar Barretto

("Barretto"), a native Spanish speaker, since prior dispatch information suggested that at least one

occupant of the vehicle spoke Spanish.  (*Id.* at 50.)  Gilbert approached the driver's side of the

vehicle cautiously and aggressively, given that the occupants might have been involved in a

homicide; he ordered the driver out of the vehicle immediately.  (*Id.* at 40, 54.)  Gilbert, with

assistance from Serafini, wound up pulling the driver out of the vehicle and placing him in

handcuffs.  (*Id.* at 57, 85.)  Gilbert placed the driver in his patrol car and transported the driver to

police headquarters for questioning.  (*Id.* at 59.)  Meanwhile, two other officers—discovery to

defense counsel apparently identified their last names as Lee and Daniels (Dkt. No. 21 at 4)—

4

approached the passenger side of the vehicle and found Dalmau sitting in the front passenger seat.

No one was found in the rear seat.  After a struggle, Lee and Daniels pulled Dalmau out of the

vehicle and put him in Serafini's patrol car for transport to headquarters.  Barretto told Dalmau in

Spanish "the reason for his stop and that he would be held until he talked to a detective."  (*Id.* at 6;

*see also id.* at 12 ("I told him that he was stopped because his vehicle matched a description, I

couldn't tell him anything else until the detectives talked to him.").)  No officer said anything else

to Dalmau at the traffic stop; Barretto and Serafini testified that the Buffalo Police Department has

a policy that patrol officers are not to speak to suspects or to give them *Miranda* rights.  (*Id.* at 13,

90.)[2]  According to this policy, patrol officers are to bring suspects to headquarters as quickly as

possible to allow investigating detectives to give the *Miranda* rights and to speak to the suspects as

needed.

     Serafini's transport of Dalmau to police headquarters had one highlight that is relevant to

the pending motion.  Serafini had a partner, Officer Erin Reed ("Reed"), who was sitting in the

front passenger seat of Serafini's patrol car.  When Serafini entered the car to begin the drive to

headquarters, Reed commented to him that she heard a rustling sound in the back seat where

Dalmau was.  (*Id.* at 87.)  Serafini then went back and inspected the rear seat.  (*Id.*)  "And I opened

up the back door and I found some pills wrapped up in foil that were laying on the seat

underneath Mr. Dalmau."  (*Id.*)  Serafini could not identify the pills on sight from their markings;

he suspected oxycodone, a suspicion that laboratory analysis confirmed after the events relevant to

---

[2] Given Barretto's testimony, on the same page of the hearing transcript, that patrol officers are trained to administer *Miranda* in some circumstances, the Court cannot discern whether any limitations imposed on patrol officers apply only to homicide suspects.

Dalmau's motion.  (*Id.* at 92.)  Upon the discovery of the pills and during the ride, Serafini and

Dalmau said nothing to each other.  (*Id.* at 88.)  Based on Barretto's presence at the traffic stop,

Serafini believed that Dalmau spoke no English.  (*Id.* at 89.)  Whether Dalmau has any

understanding of English at all is not definitively clear from the record.

C.    *Statement at Police Headquarters*

At police headquarters, Serafini and Reed escorted Dalmau to an interview room in the

Homicide Office.  (*Id.* at 91.)  Dalmau wound up sitting in the interview room for a total of about

an hour while waiting for homicide detectives to arrive.  (*Id.* at 19.)  Barretto was with Dalmau the

whole time in the interview room.  (*Id.*)  Reed might have been in the interview room with

Barretto.  (*Id.* at 18.)

What happened next in the interview room is clouded by some discrepancies in the

hearing testimony.  According to Barretto, Serafini entered the interview room with the pills and

the aluminum foil that he found.  (*Id.* at 19–20.)  Serafini, Reed, and Barretto then had a

conversation in English about the pills within Dalmau's earshot.  (*Id.* at 9, 20.)  Dalmau was sitting

about five feet away, and there was nothing about the interview room or the positions of the

officers that would have prevented Dalmau from seeing the pills.  (*Id.* at 9–10.)  Among other

comments that might have been made, Serafini "was telling me that he found the pills in the car

and that he was probably going to charge him [Dalmau] with it."  (*Id.* at 9.)  Some time into the

conversation between the three officers, Dalmau, in Spanish, "stated from behind us 'those are my

pills, I have a[n] addiction to them.'"  (*Id.* at 10.)  Barretto also testified that he was the one who

finally gave Dalmau his *Miranda* warnings about 45 minutes after the conversation with Serafini, in

6

the presence of investigating detectives.  (*Id.*  At 21.)  Serafini had a different recollection of events

in the interview room.  According to Serafini, he did not enter the interview room after

discovering the pills; he instead had a conversation with Reed outside the doorway to the interview

room that Barretto could overhear.  (*Id.* at 101.)  Serafini could not recall bringing the pills into

the interview room.  (*Id.*)  Serafini testified that he was standing about 10 feet away from Dalmau

and never heard Dalmau's alleged statement; Barretto informed him of the statement.  (*Id.* at 102.)

The discrepancies between Barretto's and Serafini's testimony about what happened in the

interview room requires the Court to make a finding about their credibility.  *See, e.g., United States

v. Lawson*, 961 F. Supp. 2d 496, 504 (W.D.N.Y. 2013) ("It is within the province of the district

court as the trier of fact to decide whose testimony should be credited.  An adverse credibility

determination is appropriately based upon inconsistent statements, contradictory evidence, and

inherently improbable testimony.") (internal quotation marks and citations omitted). From the live

testimony at the suppression hearing and the review of the hearing transcript, the Court finds

Barretto's account more credible.  First, Serafini seemed to have more trouble at the hearing

recalling details of the conversation in the interview room.  (*See* Dkt. No. 31 at 101.)  Barretto

spoke more confidently about his recollection of events.  Additionally, Barretto's account of the

conversation makes more sense.  Placing the officers' conversation within the interview room, just

a few feet from Dalmau, gives Dalmau an opportunity to see the pills and perhaps to pick up a

stray word of English if he knows any English at all.  Seeing the pills and possibly understanding

pieces of the officers' conversation would have given Dalmau a reason to make the statement that

he is alleged to have made.[3]  In contrast, Serafini's account of events in or near the interview room makes less sense.  In Serafini's account, Dalmau likely would not have seen pills that never entered the interview room and likely would not have heard a conversation occurring outside in the hallway.  Why, then, would Dalmau suddenly make a totally unprompted statement after sitting silently in the interview room for about an hour?  The record would have no answer to that question; the Court would have to speculate that Dalmau perhaps had some other communication with the officers not captured in the record, or perhaps picked a completely random time to address the pills that he would have seen Serafini take from the backseat of the patrol car.  There is no need to go down the road of sheer speculation when Barretto's account of events seems plausible and when Barretto presented generally as a credible witness.  The Court will proceed assigning significant weight to Barretto's version of events in the interview room.

As a postscript to the events of January 5–6, 2014, the driver of the GMC Yukon was interviewed by homicide detectives but then released.  (Dkt. No. 31 at 76.)  Additionally, the Government provided this update in its first response to Dalmau's motion:

> During questioning, neither the driver nor the defendant made any admissions regarding the shooting homicide.  Nor was either charged for it: the driver went on his way and the defendant was arrested on state charges solely for the pills that he left in the patrol car.  Over two weeks later, police found a "trap" or hidden compartment in the back of the vehicle, which contained more pills and a handgun.  See Complaint ¶ 5.  Subsequent investigation of the firearm matched it via ballistic analysis to the cartridge cases at the murder scene and revealed that the defendant's DNA profile matched the partial major DNA profile in the mixture swabbed from the gun.  Officers also found in the vehicle a GPS navigation device

---

[3] Of course, Dalmau is free at trial to contest that he made the statement at all.  The Court, however, cannot make a recommendation about suppression for a non-existent statement.  For the limited purpose of addressing suppression, the Court is assuming that the statement happened more or less as Barretto described it.

that contained addresses from mostly the New York City area, but also notably an address for a residence associated with the murder victim in Buffalo.

(Dkt. No. 22 at 4.)

    D.    *This Case and Dalmau's Pending Motion*

This case began when the Court signed a pre-indictment complaint on April 2, 2014.

(Dkt. No. 1.)  The Government filed the indictment, initially under seal, on September 12, 2014.

(Dkt. No. 1(1).)  The indictment contains one count of possession of a firearm by an unlawful user

of oxycodone, a Schedule II controlled substance, in violation of 18 U.S.C. §§ 922(g)(3), 924(a)(2),

and 2.  The indictment also contains a forfeiture notice for the handgun in question and some

associated ammunition.  Dalmau eventually was located in the Western District of Pennsylvania

(Dkt. No. 8), and the Court arraigned him on October 22, 2015.

Dalmau filed his motion to suppress on February 26, 2016 and his post-hearing briefing on

August 23, 2016.  (Dkt. Nos. 21, 35.)  Dalmau argues that any statements that he might have made

in the interview room before the homicide detectives arrived should be suppressed because of the

environment in the room.  Dalmau notes Barretto's testimony that Barretto had no involvement

in the events of January 5–6, 2014 except to act as a translator.  "Officer Barretto then confirmed

that Officer Serafini had no conversation with him [Dalmau] about the pills or anything else about

the case, he just walked out after getting the response he sought.  It is clear that Officer Serafini

had no reason to discuss anything about the case with an officer who was merely acting as a

translator and Officer Barretto's testimony clearly indicates the same."  (Dkt. No. 35 at 5.)  In this

sense, Dalmau likens the officers' conversation in the interview room to the improper "Christian

burial speech" that the Supreme Court highlighted in *Brewer v. Williams*, 430 U.S. 387 (1977).

Dalmau also has challenged whether the officers had probable cause or even reasonable suspicion to detain him through the traffic stop. (Dkt. No. 21 at 7.) The Government responds that exigent circumstances coupled with dispatched information about a getaway vehicle gave the officers probable cause to believe that Dalmau fled the scene of a homicide and had something to do with it. (Dkt. No. 33 at 8, 10.) As for Dalmau's statement, the Government emphasizes that the officers' conversation in the interview room was not intended for Dalmau and that the officers had no reason to believe that Dalmau could understand a conversation in English. (*Id.* at 16–17.)

## III.   DISCUSSION

### A.    *Burden of Proof*

"In a motion to suppress physical evidence, the burden of proof is initially on the defendant. Once the defendant has established some factual basis for the motion, the burden shifts to the government to show that the search was lawful." *United States v. Breckenridge*, 400 F. Supp. 2d 434, 437 (D. Conn. 2005) (citations omitted); *see also United States v. Carollo*, No. 09 CR. 1058 VM, 2011 WL 6935292, at *2 (S.D.N.Y. Dec. 30, 2011) (citations omitted). "The government has the ultimate burden of persuasion." *United States v. Magaddino*, 496 F.2d 455, 460 (2d Cir. 1974) (citation omitted). "The standard of proof on the party who carries the burden is preponderance of the evidence." *United States v. Allen*, 289 F. Supp. 2d 230, 242 (N.D.N.Y. 2003) (citation omitted); *accord United States v. Martinez*, 992 F. Supp. 2d 322, 332 (S.D.N.Y. 2014) ("On a motion to suppress, the government bears the burden of proving the propriety of law enforcement conduct by a preponderance of the evidence.") (citation omitted).

B.      *Probable Cause for Dalmau's Arrest*

Because the officers took Dalmau into custody immediately upon executing the traffic stop, this case does not present the type of scenario in which a lower level of seizure like a *Terry* stop led to additional information that subsequently justified a full arrest.  The officers thus needed probable cause to stop the GMC Yukon and to arrest Dalmau based on information that they had obtained up to that point.  "Probable cause exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested.  Courts do not isolate each factor of suspicion but instead look to the totality of the circumstances."  *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) (citations omitted).  Probable cause can rest on information from victims or eyewitnesses whom police officers reasonably believe are telling the truth.   *See Caldarola v. Calabrese*, 298 F.3d 156, 163 (2d Cir. 2002) (citations omitted).  More specifically, probable cause to stop a vehicle and to arrest its occupants can rest on 911 calls and witness statements describing a vehicle and placing it at the scene of a crime that just recently occurred.  *See, e.g., United States v. Harple*, 202 F.3d 194, 198 (3d Cir. 1999) (affirming probable cause to stop a car linked to an arson); *United States v. Williams*, 219 F. Supp. 2d 346, 361 (W.D.N.Y. 2002) (finding probable cause to search a car linked to a drive-by shooting; *see also* Wayne R. LaFave, 2 *Search & Seizure* § 3.4(c) (5th ed. and Westlaw supp.) (collecting cases distinguishing how specific a vehicle description has to be to support probable cause).

11

Here, Gilbert and the other officers had probable cause to stop the GMC Yukon with Dalmau in it. Through 911 calls and developing information from witnesses, the officers established that a white GMC Yukon or "Yukon -like" vehicle with distinguishing halogen headlights left the scene of a homicide. The officers established that the fleeing vehicle had at least two people in it, including the shooter, greatly increasing the chances that the vehicle or its occupants had evidence pertaining to the crime. Witnesses also provided information to the officers that at least one of the occupants of the vehicle spoke Spanish. A short time later, perhaps about 19 or 20 minutes later, Gilbert spotted a vehicle matching the available description; he saw the vehicle in a place where the fleeing vehicle reasonably could have been about 19 or 20 minutes after the shooting. *Cf. Waldron v. Milana*, No. 5:10-CV-0065 NPM/DEP, 2012 WL 3929898, at *9 (N.D.N.Y. Sept. 10, 2012) ("[T]he evidence linking Plaintiff to the scene initially consisted of the [witness] statements. [A witness] reported that someone matching Plaintiff's description left the scene of the fire at 203 Rowland Street in a vehicle matching the description of Plaintiff's vehicle, at around 5:45 p.m., shortly before the fire erupted."). The emerging description of the fleeing vehicle, combined with the timing of Gilbert's discovery, gave Gilbert a reasonable basis to believe that the GMC Yukon before him was in fact the fleeing vehicle. *Cf. Chambers v. Maroney*, 399 U.S. 42, 46 (1970) (affirming probable cause "to stop a light blue compact station wagon" based on witness descriptions of the car, the number of occupants, and an article of clothing that one occupant wore); *Robinson v. Cook*, 706 F.3d 25, 32 (1st Cir. 2013) (affirming probable cause to seize a car believed to be involved in a hit-and-run, based on witness descriptions of the car, the car's proximity to the scene of the incident, and indications from the warmth of the engine that the car

had been driven recently); *Capraro v. Bunt*, 44 F.3d 690, 691 (8th Cir. 1995) ("The officers who had been dispatched to Capraro's home had probable cause to seize the truck because it matched the victim's description of the vehicle used in the kidnapping."); *United States v. Breedlove*, 444 F.2d 422, 424 (5th Cir. 1971) ("Officer Hicks had an accurate, albeit general, description of the automobile and its occupants. The arrival of the appellants' automobile at the checkpoint was at a time and distance from the robbery consistent with its being the get away car. Moreover, there is no suggestion that Officer Hicks attempted or contemplated a random stopping of innocent highway travelers. He knew what he was looking for, and he found it."). Once Gilbert started following the vehicle, the driver took what appeared to Gilbert to be evasive maneuvers to lose him. The two quick left turns and 180-degree change of direction might not have meant too much by themselves but, in the totality of the circumstances here, added to Gilbert's sense that he was tracking the vehicle that witnesses connected to the homicide. The total amount of information available to Gilbert and the officers at the time sufficed to establish probable cause and justified the decision to execute a traffic stop and to arrest Dalmau and the driver immediately as homicide suspects. Accordingly, the Court recommends denying Dalmau's motion with respect to the traffic stop and his ensuing detention.

      C.    *Statement in the Interview Room*

      The Court next turns its attention to the statement that Dalmau made in the interview room. The Government does not contest that Dalmau made the statement while in custody and before receiving notice of his *Miranda* rights. In addition to the requirement of custody, though, the need for *Miranda* warnings also requires that interaction between a person and law

13

enforcement officials qualify as an "interrogation." "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

There is no formula for determining when police conduct is reasonably likely to evoke an incriminating response and thus functionally equivalent to interrogation under *Innis*. "The mere fact of police presence in a police office is not the 'functional equivalent' of express questioning." *Isasi v. Herbert*, 176 F. App'x 143, 144 (2d Cir. 2006) (summary order) (citation omitted); *but see United States v. Jackson*, 544 F.3d 351, 357 (1st Cir. 2008) ("A statement is not rendered admissible under *Miranda* simply because it is not made in response to a 'particular question.' The entire course of conduct of the officers must be examined to determine whether the statement was in response to unlawful questioning under *Miranda*."). Some cases seem to indicate that a complete lack of communication between officers and a suspect is a factor that favors the officers. *Cf. United States v. Richardson*, 427 F.3d 1128, 1133 (8th Cir. 2005) ("Richardson's interaction with the officers in the squad car was not the functional equivalent of an interrogation because the officers

14

were discussing the evidence between themselves and did not elicit any information from Richardson.  Nor were the officers applying any indirect emotional pressure on Richardson to talk."), *vacated in part on other grounds on reh'g en banc*, 439 F.3d 421 (8th Cir. 2006).  Even when officers communicate directly with a suspect who has not received *Miranda* warnings, statements from the suspect will not be considered the products of interrogation when the statements are not responsive to the officers' questions.  *Cf. United States v. Castro*, 723 F.2d 1527, 1530 (11th Cir. 1984) ("Officer Seals exclaimed, 'What in the world is going on here?' •Defendant Acosta responded, 'You want money? We got money.' •This statement was totally unresponsive to Seals' question.  It was not improperly compelled by the officer's question in a custodial setting but, on the contrary, was spontaneously volunteered by Acosta in a deliberate attempt to commit a totally separate crime—bribery of a law enforcement official.  The safeguards of *Miranda* can not be extended that far."); *United States v. Johnson*, No. 4:06CR108 HEA, 2006 WL 1698320, at *4 (E.D. Mo. June 9, 2006) ("After the defendant was told he was under arrest, but before he was advised of his *Miranda* rights the defendant stated that he couldn't go back to jail.  This statement was volunteered by the defendant and was not made in response to any questioning by the officers and is admissible even in the absence of *Miranda* warnings.").  In contrast, police conduct that, in totality, looks as if officers are giving a suspect a "last chance" to confess will push the analysis toward a finding of interrogation and a need for suppression.  *See Jackson*, 544 F.3d at 358 (vacating a conviction and sentence where, *inter alia*, the following circumstances amounted to a *Miranda* violation: "questioning by the officers before [another officer's] departure and return, the short period between the initial questioning and the time that Jackson made the statement, the

15

suggestion of leniency, Jackson's prior knowledge that the search was permissible, and the officers' obvious purpose in the earlier questioning to secure an incriminating statement from Jackson"); *see also United States v. Fautz*, 812 F. Supp. 2d 570, 638 (D.N.J. 2011) (collecting cases examining statements made during different levels of interaction with officers).[4]

Here, the circumstances of Dalmau's statement fit better with cases that have found no attempt by officers to grease the skids toward an incriminating response. Apart from a brief comment by Barretto at the traffic stop explaining why Dalmau was being taken into custody, no officers spoke to Dalmau at all between the traffic stop and the arrival of the homicide detectives. *Cf. United States v. Calisto*, 838 F.2d 711, 713 (3d Cir. 1988) (affirming the voluntary nature of a statement, where the defendant overheard officers discussed the possibility of an arrest warrant for his daughter and spontaneously said, "Don't lock my daughter up. She has nothing to do with that stuff. That's mine. I'm the one you want."); *id.* at 718 ("[Officer] McKeefry's remark regarding the possible arrest of Calisto's daughter was not directed to Calisto, was the kind of remark that an officer would normally make in carrying out his duties under the circumstances that confronted him, and was not made in a provocative manner. Moreover, it was a single isolated remark made in the presence of a suspect who showed no signs of being emotionally upset or overwrought. Finally, even if it could be said that reasonable officers might have expected a protest of some kind from Calisto upon his hearing of his daughter's possible arrest, we do not think it was reasonable to expect an inculpatory response from Calisto."). Serafini's decision to

---

[4] While Dalmau urges the Court to suppress his statement under *Brewer*, the Court finds *Brewer* inapplicable because it technically was a Sixth Amendment case, not a Fifth Amendment/*Miranda* case. *See Brewer*, 430 U.S. at 397–98.

talk to Reed and Barretto in the interview room, just five feet away from Dalmau, was not

particularly wise; it brought the situation close to the threshold identified in *Innis* without serving

any purpose.  Nonetheless, Dalmau saw the officers discover the pills in the backseat of Serafini's

patrol car and knew already that the officers had the pills.  *Cf. United States v. Hendricks*, 116 F.

App'x 684, 686 (6th Cir. 2004) (unpublished decision) (affirming the voluntariness of a statement,

where officers conducting a search discovered a gun, the defendant knew of the discovery, and the

defendant stated, "[T]hat's my gun.  I wasn't going to shoot that guy, I just wanted him to get away

from me.").  Dalmau's language barrier likely prevented him from understanding most, if not all,

of the conversation between Serafini, Reed, and Barretto.  The Court also credits the officers'

testimony for the point that they were not looking at Dalmau during their conversation or making

any gestures or comments designed to convey to Dalmau that he had a limited opportunity to

explain himself with respect to the pills.  *Cf. United States v. Fromal*, 733 F. Supp. 960, 969 (E.D.

Pa. 1990) ("We find that the remark of defendant Fromal to the effect, 'Oh, my god, you may find

a gun in the trunk of my car,' and the remark about the caliber and purchase of the gun, was

blurted out fifteen minutes into the interrogation and was not made in violation of defendant

Fromal's Miranda rights.  Therefore, the motion to suppress the remark on those grounds was

properly denied by the court prior to trial.  In addition the remark is admissible because it was

voluntarily given and was not in response to a question.") (citations omitted).  Under these

circumstances, the Government has met its burden of showing that Dalmau's statement did not

result from the functional equivalent of an interrogation, meaning that *Miranda* warnings were not

17

necessary at that time.  The Court thus recommends denying Dalmau's motion with respect to his statement in the interview room in the early morning hours of January 6, 2014.

IV.    CONCLUSION

For all of the above reasons, the Court respectfully recommends denying Dalmau's motion to suppress (Dkt. No. 21) in its entirety.

V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

___/s Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: September 7, 2016

18