**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

UNITED STATES OF AMERICA,

        v.                                                 14-CR-165-A
                                                           **DECISION AND ORDER**

CHRISTIAN DALMAU,

        Defendant.

_____

This case is before the Court following a *Fatico* hearing[1] concerning whether the Defendant "used or possessed" a Taurus nine-millimeter semiautomatic pistol "in connection with" the murder of Dustin Ortiz-Maldonado on January 5, 2014. U.S.S.G. § 2K2.1(c)(1).[2] After considering the evidence presented at the hearing, and for the reasons stated below, the Court finds by a preponderance of the evidence that the Defendant "possessed" the firearm at issue "in connection with" Ortiz-Maldonado's murder. The Court therefore concludes that the homicide cross-reference at Guideline § 2K2.1(c)(1) applies and that the Defendant's base offense level is 38, pursuant to Guideline § 2A1.2(a).

## BACKGROUND

The Defendant pled guilty to one count of possessing a firearm as an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3). The Defendant's plea arose out of events that occurred late in the evening of January 5, 2014, when the Defendant and another person were stopped in a GMC Yukon shortly after Ortiz-Maldonado was shot. The firearm the Defendant pled guilty to possessing was found in

---

[1] *See United States v. Fatico*, 603 F.3d 1053 (2d Cir. 1979).

[2] All citations to the U.S. Sentencing Guidelines are to the 2016 edition of the Guidelines Manual.

a hidden compartment in the Yukon's trunk. In addition, the Yukon matched a description of a vehicle that had been seen speeding away from the scene of the shooting.

The PSR recommends, and neither party disputes, that the relevant Guideline for the crime to which the Defendant pled guilty is found in Guideline § 2K2.1. The Defendant maintains that, pursuant to § 2K2.1(a)(6), his base offense level should be 14 because he was "a prohibited person" (that is, an unlawful user of a controlled substance) at the time of his offense. The Government and the PSR, on the other hand, recommend applying § 2K2.1(c)(1)(B). Section 2K2.1(c)(1)(B) applies if (1) a defendant "used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission of another offense"; and (2) "death resulted" from the "[]other offense."

If "death resulted" from the "[]other offense," the Guidelines recommend applying "the most analogous offense guideline from" the Guidelines for homicide, if doing so would result in an "offense level . . . greater than that" determined by § 2K2.1, which applies to certain firearms-related offenses. U.S.S.G. § 2K2.1(c)(1)(B). The PSR recommends applying the second-degree murder Guideline, which carries a base offense level of 38. *See* U.S.S.G. § 2A1.2(a). The Government recommends applying the first-degree murder Guideline, which carries a base offense level of 43. *See id.* § 2A1.1(a).

Because of the substantial difference between the parties' recommended base offense levels, and given the factual questions underlying that dispute, the Court held a *Fatico* hearing. The hearing took place over two days, during which the Court heard

from six witnesses and received several pieces of evidence. The Court also considered a transcript of, and evidence introduced at, a suppression hearing held before Magistrate Judge Hugh B. Scott on June 1, 2016. *See* Docket No. 31.

## DISCUSSION

"[D]isputed facts relevant to sentencing, even under the Guidelines, need be established only by a preponderance of the evidence." *United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir. 1992). This means that a sentencing court may, in imposing sentence, rely on facts that are only "more likely than not true." *United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003). The preponderance-of-the-evidence standard may, of course, be satisfied with direct evidence. But as is particularly important here, the standard may also be satisfied with circumstantial evidence—even when a court makes homicide findings. *See United States v. Ulbricht*, 858 F.3d 71, 125 (2d Cir. 2017) (finding that district court did not err in considering "circumstantial evidence connecting . . . drug-related deaths to" defendant's criminal activity as part of "assessing the seriousness of [defendant's] crimes when [the court] considered the factors listed in 18 U.S.C. § 3553(a)").

## FINDINGS OF FACT

### 1. The murder of Dustin Ortiz-Maldonado and the Defendant's arrest

On January 5, 2014, at approximately 10:05 p.m., the Buffalo Police Department (BPD) received reports of a shooting at 132 Newfield Drive in Buffalo, New York. Gov't Ex. 21A at 1; Supp. Tr. 31:2-6.[3] Witnesses reported hearing people shouting in Spanish

---

[3] Citations to "Supp. Tr." refer to the transcript of the suppression hearing held before Judge Scott. *See* Docket No. 31. Citations to "Evid. Tr." refer to the transcript of the the *Fatico* hearing. *See* Docket Nos. 61 & 62.

near a white SUV—"possibly a Yukon"—before the shooting. Gov't Ex. 21C, 132 Newfield St. Calls 7, 15, 17. When officers arrived at 132 Newfield, they discovered a body lying in the driveway. Evid. Tr. 20:2-11; Gov't Ex. 5A – 5C. The victim had been shot three times in the head and once in the shoulder. Gov't Ex. 9 at 1. The victim's driver's license identified him as Dustin Ortiz-Maldonado. Gov't Ex. 10.

BPD officers broadcast a description of the vehicle witnesses had seen leaving the scene of the shooting. Supp. Tr. 35:5 - 36:22; Gov't Ex. 21C, Newfield St. Call 7. Approximately five minutes later, BPD Officer Dennis Gilbert, who was on routine patrol, observed a white GMC Yukon headed west on Route 33. Supp. Tr. 43:7- 47:20. Officer Gilbert began to follow the Yukon, which exited Route 33, turned around, and reentered Route 33 in the opposite direction. Supp. Tr. 45:22 – 48:25.

Officer Gilbert followed the Yukon for six to eight minutes. Supp. Tr. 55:17-21. After patrol cars "slowed traffic dramatically" to force the Yukon off Route 33, BPD officers stopped the vehicle at 10:21 p.m., approximately sixteen minutes after witnesses first called 911 to report the shooting at 132 Newfield. Supp. Tr. 55:2-6; *id.* 62:19-22; Gov't Ex. 21B at 1. Officer Gilbert testified that the period of time that had elapsed between the shooting and the stop was "consistent with" the period of time it would have taken to drive from 132 Newfield to the location where the police had stopped the Yukon. Supp. Tr. 56:5-22. Officers found two people in the vehicle, both of whom they arrested: the driver, later identified as Alexander Lorenzi; and the passenger, later identified as Christian Dalmau, the Defendant in this case.

After the Defendant was placed in a patrol car, a BPD officer "heard rustling in the back seat." Supp. Tr. 87:9-10. An officer then "opened up the back door and . . .

4

found some pills wrapped up in foil that were laying on the seat underneath [the Defendant]." Supp. Tr. 87:10-12. At the police station later that evening, the Defendant admitted that the pills were his. Supp. Tr. 10:2-4.

Later that night, Detectives interviewed Lorenzi, the Yukon's driver. Lorenzi told detectives that the Yukon belonged to the Defendant;[4] that he and the Defendant had driven from Brooklyn to Buffalo the night before; and that they had arrived in Buffalo at approximately 6:00 a.m. on January 5. Evid. Tr. 38:15-20; Gov't Ex. 23 at 1. Lorenzi told detectives that, on the evening of January 5, he and the Defendant had visited the Defendant's cousins and were going "to . . . see a girl" when they were stopped. Evid. Tr. 38:21-25. Lorenzi also said that he had met Ortiz-Maldonado just once before, at a bar approximately one month earlier. Evid. Tr. 39:1-8. Detectives released Lorenzi because they "thought he was being truthful." Evid. Tr. 43:12-14.

At least one of Lorenzi's statements was false, however. A video taken from Ortiz-Maldonado's Instagram account showed Ortiz-Maldonado and Lorenzi together in a car, contrary to Lorenzi's assertion that he had only met Ortiz-Maldonado once before in a bar. Evid. Tr. 66:11 – 67:23. In the video, Ortiz-Maldonado is seen wearing a red hooded sweatshirt and a black knit hat (Gov't Ex. 19)—the same clothing he was wearing on the night he was shot. *Compare* Gov't Ex. 5A, 5C.

### 2. Evidence recovered from the Yukon

The day after Ortiz-Maldonado was shot, detectives searched the Yukon in which the Defendant and Lorenzi had been stopped. The detectives found several items,

---

[4] The Yukon was in fact registered to Domingo Guerrero-Guerrero. Evid. Tr. 48:11-14. When the Defendant was arrested in this case, he was stopped with Guerrero-Guerrero in Pennsylvania. PSR ¶ 52. Guerrero-Guerrero is currently charged in both the Western District of Pennsylvania and the Eastern District of New York with cocaine trafficking conspiracies. *See* W.D. Pa. Docket No. 2:15-cr-0256-CB; E.D.N.Y. Docket No. 1:15-CR-0596-PKC.

including clothing, a water bottle, a straw, and a GPS unit. Evid. Tr. 21:15 - 23:10; Gov't Ex. 6B-6D. The GPS unit, which was located on the Yukon's front passenger seat (where the Defendant was sitting when the vehicle was stopped), contained several addresses in New York City and one address in Buffalo. Gov't Ex. 7. The Buffalo address was the same address listed on Ortiz-Maldonado's driver's license. Evid. Tr. 23:23-25:20; Gov't Ex. 7, 10.

In the weeks that followed, the BPD garage received several calls from an attorney attempting "to take the [Yukon] back" by "tr[ying] to go around the normal routes" for doing so. Evid. Tr. 45:23 – 46:3; *id.* 49:9 – 50:1. Their interest piqued, the detectives decided to conduct a second search of the Yukon. The second search uncovered "a wire that was dangling" from the counsel between the driver's and front passenger's seats. Evid. Tr. 50:23. The wire appeared to have been snipped. *Id.* Next to the snipped wire were two toggle switches that, detectives believed, "weren't . . . standard equipment to the [Yukon]." Evid. Tr. 50:23 – 51:1. *See also* Gov't Ex. 8B, 8C. In addition to the snipped wire and toggle switches, detectives searched the Yukon's undercarriage and found, at the rear of the vehicle, (1) a spare tire with holes for five lug nuts, despite the fact that the Yukon's road wheels had holes for six lug nuts; and (2) beneath the spare tire, welding that did not appear to belong to the vehicle. Evid. Tr. 52:1-7; *id.* 53:9-24.

Detectives then lifted the carpet in the rear of the Yukon and found a hinge. Evid. Tr. 54:17 – 22. The hinge led detectives to "realize[] that there was a hidden compartment" in the rear of the vehicle. Evid. Tr. 55:1-3. Mechanics used crowbars to force the hidden compartment open. Evid. Tr. 55:1-3. In the compartment, officers

6

found a plastic bag containing paper towels; the paper towels contained packets of aluminum foil; and the foil packets, in turn, contained pills. Evid. Tr. 56:9-23; Gov't Ex. 8L. The detectives also found a pistol, which was later identified as a semiautomatic nine-millimeter Taurus model PT 24/7. Gov't Ex. 8M-8N.

The pills found in the hidden compartment were the same as those the Defendant had tried to hide on the night he was arrested. Further, like the pills found in the hidden compartment, the pills on the Defendant's person were wrapped in foil.[5] Evid. Tr. 61:12 - 25.

The pistol, meanwhile, was connected to the shooting of Ortiz-Maldonado. The pistol had a seventeen-round magazine that contained only thirteen rounds; Ortiz-Maldonado had been shot four times. Evid. Tr. 58:23-59:5; *id.* 127:6-9. And an Erie County Central Police Services (CPS) firearms examiner concluded, after a detailed analysis, that cartridge casings recovered at 132 Newfield had been fired from the pistol found in the Yukon. Evid. Tr. 138:17-22; Gov't Ex. 12A-I.

Finally, a buccal swab containing the Defendant's DNA was later found to match, to varying degrees, several items found in the Yukon. *See* Gov't Ex. 18. As relevant here, a DNA profile obtained from the pistol contained a mixture of DNA from four individuals. *Id.* at 2. The "partial major DNA profile obtained from the [pistol] . . . match[ed] the DNA profile" of the Defendant. *Id.* Further, an analysis found that "[t]he evidence DNA profile [was] . . . 4.93 Million times more probable if the sample originated from [the Defendant] and three unknown, unrelated individuals rather than if it originated from four unknown, unrelated individuals in the U.S. population." *Id.* Thus, a

---

[5] DNA analysis later determined that the Defendant was "excluded as a contributor to the genetic material" found on a swab of the foil packets. *See* Gov't Ex. 18 at 4.

forensic biologist was able to conclude that "there is extremely strong scientific support" for the conclusion that the Defendant "and three unknown, unrelated individuals contributed to the mixture, rather than four unknown, unrelated individuals." *Id.*

## CONCLUSIONS OF LAW

The evidence described above is sufficient for the Court to conclude, by a preponderance of the evidence, that the Defendant "possessed" the firearm "cited in the offense of conviction"—that is, a Taurus nine-millimeter semiautomatic pistol—"in connection with the commission" of the second-degree murder of Dustin Ortiz Maldonado on January 5, 2014. Three findings, taken together, lead to this conclusion.

First, it is largely undisputed that Ortiz-Maldonado was murdered. On the evening of January 5, 2014, witnesses heard several gunshots and saw a person later identified as Ortiz-Maldonado lying at the foot of the driveway at 132 Newfield. Witnesses heard shouting before Ortiz-Maldonado was shot, a fact that *might* support the conclusion that the homicide was voluntary manslaughter, rather than murder. *See* 18 U.S.C. § 1112(a) ("Manslaughter is the unlawful killing of a human being without malice. It is of two kinds: Voluntary—Upon a sudden quarrel or heat of passion. . . .") But Ortiz-Maldonado had been shot in the head three times, a fact that strongly supports the finding that the person who shot Ortiz-Maldonado acted "with malice aforethought." 18 U.S.C. § 1111(a). Moreover, no witnesses reported seeing Ortiz-Maldonado involved a physical altercation, nor was any weapon found on or near Ortiz-Maldonado's body—both facts that might support a finding that Ortiz-Maldonado was killed "[u]pon a sudden quarrel" or in the "heat of passion." 18 U.S.C. § 1112(a). *Compare United States v. Whiteside*, 207 F. Supp. 3d 311, 323 (S.D.N.Y. 2016) ("The

fatal knifing happened during a physical altercation and only after [the defendant] saw [the victim] holding a gun and reasonably feared for his life. That is enough to establish a 'heat of passion' killing and negate the malice element.")

Thus, a preponderance of the evidence shows that Ortiz-Maldonado was murdered. The Court need not, and does not, make a finding that the murder was in the first degree, rather than in the second degree. The Government introduced evidence of premeditation, such as the fact that Ortiz-Maldonado's address had been programmed into the GPS unit that detectives found in the Yukon. But a finding of first-degree murder would not affect the Court's Guideline calculation because even a finding of *second-degree* murder would result in a Guideline imprisonment range that far exceeds the ten-year statutory maximum penalty for the crime to which the Defendant pled guilty. In other words, any dispute over whether the murder was in the first degree, rather than the second, would not affect the Court's Guideline calculation, and it will not affect the Court's sentence. Thus, the Court need not resolve the dispute. *See* Fed. R. Crim. P. 32(i)(3)(B). The Court therefore finds, only for purposes of calculating the appropriate base offense level, that Ortiz-Maldonado was murdered in the second degree.

Second, a preponderance of the evidence shows that Ortiz-Maldonado was murdered with the pistol found in the Yukon's hidden compartment. This finding rests heavily on the CPS firearms examiner's testimony (which was largely undisputed) that two of the cartridge casings found at the murder scene had been fired from the pistol found in the Yukon's hidden compartment. In addition, the pistol's seventeen-round magazine was missing four rounds, and Ortiz-Maldonado had been shot four times.

Third and finally, in his plea agreement the Defendant admitted to "knowingly possess[ing]" the pistol that was found in the Yukon. Plea Agreement ¶ 4.a.[6] By itself, this admission is sufficient to show by a preponderance of the evidence that the Defendant "possessed" the gun that was used to murder Ortiz-Maldonado. But the Defendant's admission is bolstered by DNA evidence which found "extremely strong scientific support" (Gov't Ex. 18 at 2) to conclude that the Defendant's DNA was on the pistol. Of course, the DNA analysis cannot identify when the Defendant's DNA was transferred to the pistol, nor can it identify what the Defendant was doing with the pistol when he transferred his DNA to it. But the DNA evidence does lend independent support to the Defendant's admission. And, in any event, the answers to those questions are irrelevant to the Court's conclusion that the Defendant "possessed" the pistol. In other words, to find that § 2K2.1(c)(1) applies, the Court need not find that the Defendant "used" the pistol on a particular date or for a particular purpose; it must only find that the Defendant "possessed" the pistol.

The evidence described above therefore shows that the Defendant possessed the pistol that was used to murder Dustin Ortiz-Maldonado in the second degree. The only question, then, is whether the Defendant's "possess[ion]" of that gun was "in

---

[6] "[A] factual stipulation in a plea agreement is a valid basis for a factual finding relevant to sentencing only when the record clearly demonstrates that the stipulation was knowing (in the sense that the record clearly demonstrates that the defendant fully understood the potential consequences of his stipulation) and voluntary. This test will ordinarily be satisfied where: (i) the plea agreement makes a stipulation clearly and explicitly and (ii) the defendant signs the agreement and allocutes to understanding the consequent loss of the right to put the government to its proof. It will ordinarily not be necessary for the court taking the plea to question a defendant specifically about each factual stipulation." *United States v. Granik*, 386 F.3d 404, 413 (2d Cir. 2004) (quotation marks, citations, and brackets omitted). The Court's detailed plea colloquy showed that the Defendant understood each of the terms of his plea agreement, including its factual basis; that he understood his right to trial and that, by pleading guilty, he would be giving up his right to "put the government to its proof"; and, finally, that his decision to enter into his plea was knowing, voluntary, and intelligent.

connection with" Ortiz-Maldonado's murder, as the Guidelines define that phrase. *See* U.S.S.G. § 2K2.1(c)(1).

The Guidelines do not define the phrase "in connection with" in § 2K2.1(c)(1). The Guidelines' commentary, however, states that § 2K2.1(c)(1) applies "if the firearm . . . facilitated" another offense. U.S.S.G. § 2K2.1 cmt. 14(A). The Second Circuit has given a similarly broad interpretation to the phrase "in connection with" in a Guideline related to § 2K2.1(c)(1): According to the Second Circuit, the phrase "in connection with" in Guideline § 2K2.1(b)(6)(B) "should be construed as equivalent to the 'in relation to' language of 18 U.S.C. § 924(c)(1)." *United States v. Spurgeon*, 117 F.3d 641, 643-44 (2d Cir. 1997).[7] Thus, a firearm is "possessed . . . in connection with" another offense "'[s]o long as the government proves by a preponderance of the evidence that the firearm *served some purpose* with respect to'" that other offense. *Id.* at 644 (quoting *United States v. Wyatt*, 102 F.3d 241, 247 (7th Cir. 1996)) (emphasis added). "'[C]onversely, where the firearm's presence is merely coincidental to that conduct, the requirement is not met.'" *Id.* (quoting *Wyatt*, 102 F.3d at 247).

The Defendant's possession of the pistol was "in connection with" Ortiz-Maldonado's murder under either interpretation of that phrase. A preponderance of the evidence easily showed that the pistol "facilitated" Ortiz-Maldonado's murder because the pistol *was used* to murder Ortiz-Maldonado. U.S.S.G. § 2K2.1 cmt. 14(A). And a

---

[7] The Second Circuit does not appear to have interpreted the phrase "in connection with" in Guideline § 2K2.1(c)(1). *Spurgeon*, however, interprets that same phrase in Guideline § 2K2.1(b)(6)(B), a Guideline that, like § 2K2.1(c)(1), enhances a defendant's base offense when a firearm was "used or possessed . . . in connection with another felony offense." U.S.S.G. 2K2.1(b)(6)(B). There is no apparent reason why the Court should not give the same interpretation to an identical phrase found in two similar Guidelines. Indeed, the Guidelines' commentary supports the view that the phrase "in connection with" in § 2K2.1(b)(6)(B) and § 2K2.1(c)(1) should receive identical interpretations. The commentary states that *both* Guidelines "apply if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense or another offense." U.S.S.G. § 2K2.1 cmt. 14(A).

preponderance of the evidence likewise showed (again, easily) that the pistol "served some purpose with respect to'" Ortiz-Maldonado's murder—again, it was used to commit the murder. *Spurgeon*, 117 F.3d at 644 (quotation marks omitted).

Further, although the Court need not make a finding of knowledge or intent to apply § 2K2.1(c)(1)'s cross-reference, a preponderance of the evidence shows that the Defendant knew that the pistol he possessed was used to murder Ortiz-Maldonado.[8] As part of his plea agreement, the Defendant admitted that he was the "sole passenger" in the Yukon on the night of January 5, 2014. *See* Plea Agreement ¶ 4.a. That admission means that the person who shot Ortiz-Maldonado was one of two people: the Defendant or Lorenzi. The Defendant was therefore either the driver of the Yukon, in which case he would almost certainly had to have seen, or been aware of, the murder so that he could quickly drive away; or he was, in fact, the shooter. Thus, a preponderance of the evidence shows that the Defendant knew that the gun found in the Yukon—a gun he admitted possessing—was used to murder Ortiz-Maldonado.

At the *Fatico* hearing, the Government introduced, and attempted to introduce, evidence that Ortiz-Maldonado's murder was related to narcotics trafficking. The Government also introduced evidence of the Defendant's consciousness of guilt and other evidence tying him to the murder. In determining the appropriate base offense level, however, the Court need not, and does not, consider evidence of motive or

---

[8] The cross-reference at § 2K2.1(c)(1) is satisfied in one of two ways: First, "[i]f the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense"; and second, "[i]f the defendant . . . possessed or transferred a firearm or ammunition cited in the offense of conviction *with knowledge or intent* that it would be used or possessed in connection with another offense." (Emphasis added.) A preponderance of the evidence in this case satisfied the first prong of § 2K2.1(c)(1). Thus, the Court need not make a finding as to the second prong, which, unlike the first prong, contains a scienter element. However, a finding of knowledge or intent as to the first prong is certainly relevant to the Court's consideration of the factors in 18 U.S.C. § 3553(a).

12

consciousness of guilt. Likewise, the Court need not, and does not, make a specific finding that the Defendant, rather than Lorenzi, murdered Ortiz-Maldonado. The homicide cross-reference in Guideline § 2K2.1(c)(1)(B) applies when a person "use[s]" a firearm "in connection with" a murder. Applying the "use[]" provision of the cross-reference in this case would require a finding that the Defendant murdered Ortiz-Maldonado. That finding, in turn, would likely require evidence of motive or consciousness of guilt.

But the narrow question before the Court is simply whether the § 2K2.1(c)(1)'s cross-reference applies in this case. Answering that question does not require the Court to find that the Defendant murdered Ortiz-Maldonado. Rather, to answer that question it is sufficient to find only that Ortiz-Maldonado was murdered and that the Defendant "possessed" a firearm "in connection with"—that is, a firearm that "facilitated," U.S.S.G. § 2K2.1 cmt. 14(A)—Ortiz-Maldonado's murder. The Court therefore need not make any finding as to whether the Defendant, rather than Lorenzi, murdered Ortiz-Maldonado on January 5, 2014.

## CONCLUSION

For the reasons stated above, the Court finds by a preponderance of the evidence that the Defendant "possessed" the firearm "cited in the offense of conviction in connection with the commission" of the murder of Dustin Ortiz-Maldonado. The PSR therefore correctly finds that the base offense level is 38, pursuant to Guideline § 2K2.1(c)(1)(B) and § 2A1.2(a). The Defendant's objections to the PSR are overruled.

Sentencing remains scheduled for August 29, 2017 at 12:30 p.m.

**SO ORDERED.**

Dated: August 1, 2017                                       _s/Richard J. Arcara_  
   Buffalo, New York                                 HONORABLE RICHARD J. ARCARA  
                                                             UNITED STATES DISTRICT JUDGE